UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| WILLIAM MORRIS THOMAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) CASE NO. CV 03-B-2616-S |
| JOHNSON & JOHNSON, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM OPINION

This case is currently before the court on defendants' Motion for Summary Judgment, (doc. 36).[1] Plaintiff William Thomas has sued defendants Johnson & Johnson and DePuy Orthopaedics, Inc. under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"), alleging a manufacturing defect and an inadequate warning. (Doc. 24.) Defendants move for summary judgment on the grounds that (1) there are no genuine issues of material fact, and (2) plaintiff's state law claim is preempted under federal law. Upon consideration of the record, the submission of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendants' Motion for Summary Judgment is due to be granted.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F. 2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144,157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. V. Catrett*, 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* At 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* At 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every reasonable inference. *See Brown v. City of Clewiston*, 848 F. 2d 1534, 1540 n. 12 (11th Cir. 1988).

## II. DISCUSSION

A. **Preemption**

Defendants argue that plaintiff's state law claims are preempted by § 360k(a) of the Medical Device Amendments (MDA). § 360k(a) provides:

> [N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a).

Defendants argue that "[o]nce the FDA accepted and approved [the porous coating] of the LCS [Total] Knee's manufacturing process as it did, and thereby made it part of its [Pre-Market Approval], it became an FDA requirement specific to DePuy's LCS Knee."[2] (Doc. 38.) According to defendants, plaintiff's state law claims seek to impose liability on DePuy for making its product in conformity with the prerequisites approved by the FDA. (*Id.*) Defendants' interpretation of 42 U.S.C. § 360k(a) is contrary to the Eleventh Circuit's.

The Eleventh Circuit applied this statute to a Class III medical device subject to the Pre-Market Approval (PMA) process in *Goodlin v. Medtronic*. *Goodlin*, 167 F.3d

---

[2]Prosthetic knees are considered Class III medical devices by the FDA. (Doc. 37, Ex. 4 ¶16.) Class III devices require the highest level of control and regulation by the FDA, (id. at ¶13), because the FDA deems such control to be necessary to assure their safety and effectiveness, (id. at ¶11).

3

1367 (11th Cir. 1999). In *Goodlin*, a cardiac pacemaker recipient sued a manufacturer of pacemaker leads,[3] asserting common law claims under Florida law for negligent design and strict product liability. *Id.* The Eleventh Circuit held that the MDA did not preempt plaintiff's claims, even though the Food and Drug Administration (FDA) approved the leads pursuant to the PMA process for Class III devices. *Id.*

The court in *Goodlin* looked to the Supreme Court's decision in *Medtronic, Inc. v. Lohr*, the Court's first attempt to elucidate the extent to which section 360k(a) of the MDA preempts product liability suits arising under state law. However, because of an important difference in the PMA process, which applied to the defendant's product in *Goodlin*, and the 510k process, the far less thorough process which applied to the defendant's product in *Lohr*, the *Goodlin* court was able to extract only broad principles from the *Lohr* decision.[4] *Id.* at 1371. The court also noted that the *Lohr* Court "fractured in all but irreconcilable manner over the extent to which 360k(a) would ever preempt a general state common law tort claim. *Id.* (citing *Mitchell v. Collagen Corp.*, 126 F.3d 902, 910 (7th Cir. 1997), *cert. denied*, 523 U.S. 1020 (1998)).

---

[3] A lead is the wire in a pacemaker that transmits the heartbeat-steadying electrical impulse from the pulse generator to the heart.

[4] In *Lohr*, the Court looked at the 510k "substantially similar" process for obtaining FDA approval. The 510k process was created because the normal PMA process is so lengthy. Under the 510k process, a manufacturer can show that its product is "substantially similar" to one already on the market. "The § 510(k) notification process is by no means comparable to the PMA process; in contrast to the 1,200 hours necessary to complete a PMA review, the § 510(k) review is completed in an average of only 20 hours." *Lohr*, 518 U.S. 470, 477-79 (1996).

The court in *Goodlin* held that the FDA's approval through the PMA process did not impose a *requirement* that was different from or in addition to a requirement imposed by state common law claims. *Goodlin*, 167 F.3d 1367. The court noted that "to prevail on its preemption argument in this case, [defendant manufacturer] must identify a **specific federal requirement imposed on its particular device** that would preempt any conflicting or additional state requirement inherent in a jury verdict in [plaintiff's] favor." *Id*. at 1372 (emphasis added). The court pointed out that while the MDA imposes many requirements upon the PMA applicant, it imposes no ascertainable requirements upon the device itself. The court noted:

> The approval represents only a finding that the manufacturer's proposal to market a device has reasonably assured the FDA of the device's safety and effectiveness. Nor does the FDA's willingness to notify an applicant of deficiencies and to propose modifications to the PMA application add any further force to Medtronic's argument for preemption, because an applicant who corrects or modifies a deficient PMA application before receiving the FDA's approval stands in no better position than an applicant whose initial PMA application was flawless. In either case, the FDA enters a finding that the applicant has furnished the relevant assurances and therefore may begin to market its device. In neither case, however, does the approval provide any indication of what (if any) specific substantive requirements the FDA may have applied to reach that result. . . . **The FDA's approval is clearly specific to the device under review, but because the approval itself neither reveals nor imposes any ascertainable substantive prerequisite for approval that we could compare to a purportedly conflicting state requirement, the approval itself does not fit within section 360k(a)(1)'s demand for a specific federal requirement.**

*Id*. (Emphasis added).

5

Like the pacemaker in *Goodlin*, plaintiff's prosthetic knees were class III devices, and underwent the rigorous PMA process. *Id.* As in *Goodlin*, the FDA instructed the manufacturer that after approval it could not change the approved labeling, design, or manufacturing process in any way that would affect the safety or effectiveness of the device. *Id.* at 1370.

Furthermore, the *Goodlin* court's analysis was premised on the idea that the PMA process provides only an assurance of minimal safety for public consumption, and does not address the appropriate standards of liability once the product enters the marketplace. *Id.* at 1378. Therefore, in the present case, whether the FDA accepted and approved the porous coating applied to the LCS Total Knee ("LCS Knee") components is irrelevant.

Following the analysis by the Eleventh Circuit in *Goodlin*, the **approval** of the porous coating does not equate to a **specific federal requirement** imposed on the LCS Knee. As noted in *Goodlin*, "the approval itself does not fit within § 360k(a)(1)'s demand for a specific federal requirement." *Id.* at 1376. The Eleventh Circuit held:

> [N]either the FDA's actual review of a device and its supporting information nor the agency's eventual approval of the device imposes any ascertainable requirement upon the device. In the typical PMA review and approval and, more particularly, in the context of [the PMA of defendant's pacemaker lead], the FDA issues no regulation, order, or any other statement of its substantive benchmark.

*Id.* at 1375.

Defendants cite the court to *Griffith v. General Motors Corp.*, 303 F.3d 1276 (11th

6

Cir. 2002) for the proposition that "liability for damages cannot be imposed under state law 'for doing what a federal act or regulation 'authorized' a defendant to do.'" (Doc. 45 at 11 [citing *Griffith*, 303 F.3d at 1281].)  Read in its entirety however, *Griffith* lends no support to plaintiff's position and is not inconsistent with the holding in *Goodlin*.  In *Griffith* plaintiff's claim was preempted by a federal law that *required* manufacturers of vehicles to choose from several specific options in installing a restraint system in their passenger cars and trucks.  *Griffith*, 303 F.3d at 1279.  Thus, unlike *Goodlin* and the instant case, *Griffith* involved a specific regulation mandating certain action.

While the court is aware of and has read the cases from other circuits finding that the PMA process establishes preemptive federal requirements, this court is bound to follow *Goodlin*.  Applying the analysis in *Goodlin* to the facts of this case, plaintiff's claims are not preempted by virtue of the FDA's Pre-Market Approval (PMA) of defendant DePuy's LCS Total Knee.

B.  **No Genuine Issue of Material Fact**

Under the AEMLD, prescription medical devices are "unavoidably unsafe products."  *See Emody v. Medtronic, Inc.*, 238 F. Supp. 2d 1291, 1296 (N.D. Ala. 2003). Plaintiff's prosthetic knees are "implantable, prescription-only medical device[s]."  *See id.*

In the case of unavoidably unsafe products that are "properly prepared[,] the adequacy of the accompanying warning determines whether the drug, as marketed, is defective, or unreasonably dangerous."  *Stone v. Smith, Kline & French Laboratories*, 731

F.2d 1575, 1579 (11th Cir. 1984). Therefore, a manufacturer of an unavoidably unsafe product may be liable if it does not properly prepare the product or it does not adequately warn. *See Emody*, 238 F. Supp. 2d 1291. Plaintiff argues that the prosthetic knees were not "properly prepared"; in other words, plaintiff claims the knees contained a manufacturing defect. Plaintiff also argues that, even if the product was properly prepared, the warning was inadequate.

Therefore, plaintiff's brief sets forth two theories of liability:

> In the case at bar, the crux of the Plaintiff's claim, and of the dispute in the evidence, involves the prosthesis' deviation from federally approved design standards for the device. Thus, one component of the Plaintiff's claim is based upon a manufacturing defect, which is specifically cognizable under the AEMLD. The other potential aspect of the Defendants' liability is based upon their providing an inadequate warning of the dangers posed by the use of the device.

(Doc. 40 at 5.) Thus, plaintiff alleges a manufacturing defect and an inadequate warning.[5]

---

[5]Plaintiff's complaint alleges a claim for defective design. However, defendants argue in their brief in support of their Motion for Summary Judgment that a design defect claim is not available in the present case because the product at issue is "unavoidably unsafe." *See Emody v. Medtronic, Inc.*, 238 F. Supp. 2d 1291, 1296 (N.D. Ala. 2003) ("According to [defendants], under AEMLD, prescription medical devices are unavoidably unsafe products, and where inherent risks are at issue, the only other permissible theory [other than manufacturing defect] is inadequate warning. [Plaintiff] claims that the application of the unavoidably unsafe products doctrine should not apply to an implantable, prescription-only medical device. The court agrees with [defendants]. The TSRH spinal rod is a prescription-only medical device that has an unavoidably unsafe characteristic.") (citations omitted). Plaintiff does not argue in this case that a design defect claim is available.

The cases cited by the court in *Emody* note Alabama's adoption of Comment k to Section 402A of the Restatement (Second) of Torts, which reads as follows: "There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. . . . Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous." *Stone*, 447 So.2d at 1302; *Purvis v. PPG Industries, Inc.*, 502 So.2d 714, 718 (Ala. 1987). The plaintiff in the instant

(Doc. 38, 40.)

*1. Manufacturing Defect*

Plaintiff alleges that his prosthetic knees were not "properly prepared" because the "coating applied to the [prosthetic knees] during the manufacturing process deviated from the specified range . . . approved by the FDA." (Doc. 40 at 1-2.) Specifically, plaintiff alleges that the average particle size and coating thickness varied from the specifications approved by the FDA, and that those variations could have caused the prosthesis to loosen. (*Id.* at 2.)

"An essential element of all product liability cases is expert testimony, passing

---

case alleges only a manufacturing defect, that the product was not "properly prepared," and inadequate warning, that the product was not "accompanied by proper directions and warning."

In any case, plaintiff has not offered sufficient evidence to prove a design defect claim. "In order to prove that a product is defective for purposes of the AEMLD, a plaintiff must prove that a safer, practical, alternative design was available to the manufacturer at the time it manufactured the [product]." *General Motors v. Jernegan*, 883 So. 2d 646 (Ala. 2003). The existence of a safer, practical, alternative design must be proved by showing that:

"(a) The plaintiff's injuries would have been eliminated or in some way reduced by use of the alternative design; and that

(b) taking into consideration such factors as the intended use of the [product], its styling, cost, and desirability, its safety aspects, the foreseeability of the particular accident, the likelihood of injury, and the probable seriousness of the injury if that accident occurred, the obviousness of the defect, and the manufacturer's ability to eliminate the defect, the utility of the alternative design outweighed the utility of the design actually used.

*Id.* (quoting *Beech v. Outboard Marine Corp.*, 584 So.2d 447, 450 (Ala. 1991)). Plaintiff has only offered evidence that the prosthetic knees varied from their original specifications, and that the variance may have prevented the knees from bonding properly. Therefore, plaintiff has not create an issue of material fact with regard to a design defect claim.

9

*Daubert* muster, that a defect was the medical cause of plaintiff's claimed injuries."[6]

*Emody v. Medtronic, Inc.*, 238 F. Supp. 2d 1291, 1295 (N.D. Ala. 2003) (citing *Tidwell v. Upjohn Co.*, 626 So. 2d 1297, 1299 (Ala. 1993)).

In order to satisfy the expert testimony requirement, plaintiff relies exclusively on two reports written by Raymond G. Thompson, Ph.D. ("Dr. Thompson") (Doc. 41.) The first report ("the September report"), submitted on September 24, 2004, consists of Dr. Thompson's findings as to a DePuy Rotating Tibial Platform, which is a part of the LCS Knee. (Doc. 41, Ex. 1.) Dr. Thompson found that the Rotating Tibial Platform did not conform to the specifications submitted to the FDA for pre-market approval in 1984. (*Id.*) Dr. Thompson found that the average coating thickness was 565 microns and the average particle size was 218 microns. The specifications submitted to the FDA in 1984 called for a thickness of 575 to 675 microns and an average particle size of 20 to 200 microns. Therefore, the device analyzed by Dr. Thompson in September failed to conform to the specifications submitted by DePuy to the FDA in 1984 for PMA approval.

However, Dr. Thompson's September report fails to create an issue of fact as to a manufacturing defect for two reasons. First, the September report is based "on a DePuy

---

[6] Plaintiff's argument that expert testimony is not necessary in the present case is unconvincing. "The purpose of expert testimony is to aid the trier of fact where the subject matter is beyond the ken of the average juror." *Tidwell v. Upjohn Co.*, 626 So.2d 1297, 1300 (Ala. 1993). A prosthetic "Total Knee System," which is implanted without cement, is a complex medical device. *See Emody*, 238 F. Supp. 2d 1291. The alleged defect, the knees' failure to properly bond to plaintiff's bones because of a variation in the coatings' average particle size, is also far "beyond the ken of the average juror."

LCS Knee tibial tray of unknown origin, not one implanted in [plaintiff]." (Doc. 38 at 15.) Plaintiff has not disputed this fact. Second, Dr. Thompson's findings are consistent with the specifications applicable to plaintiff's prosthetic knee. The specifications submitted by DePuy to the FDA in 1984, and used in Dr. Thompson's comparisons with the LCS Knee tibial tray of unknown origin, no longer governed the manufacture of the LCS Knee at the time plaintiff's knee was made.

The gist of Dr. Thompson's second report ("the December report") is the same as the September report, except that he did not analyze the average coating thickness. Dr. Thompson states that the average particle sizes of the coating used in plaintiff's components were 240 and 242 microns (for the left and right knees), while the specifications submitted to the FDA in 1984 for PMA approval called for an average particle size of 20-200 microns. (*Id.*)

According to Dr. Thompson, "[t]he difference in the coating attributes from the specified range **could result** in changed bonding strength of the device to bone cement or natural tissue. This lack of bonding or reduced bonding strength **could have** caused the device to loosen prematurely." (Doc. 41, Ex. 1) (emphasis added).

However, plaintiff has submitted no evidence showing that the specifications submitted to the FDA in 1984 are the specifications applicable to the manufacture of his LCS Knees. Defendants, on the other hand, have submitted evidence that the specifications submitted to the FDA in 1984 for PMA approval were not in effect when

11

plaintiff's LCS Knees were manufactured. (Doc. 37, Ex. 4, Ex. 2.) DePuy's Director of Materials Research stated that the applicable PMA approval for plaintiff's LCS Knees was Supplement 17,[7] which was submitted in 1991 and approved by the FDA in 1994.[8] (Doc. 37, Ex. 2 ¶15.) DePuy's Vice President of Medical Affairs stated that the specifications "provided to the FDA in DePuy's application for [PMA approval] Supplement 17 were in effect at the time of manufacture of the ... components of the LCS Knees implanted in [plaintiff]." (Doc. 37, Ex. 4 ¶36.)

The Supplement 17 specifications called for a particle size of 168-258 microns. Dr. Thompson's report states that "[b]ased on the new specifications, all three supplied DePuy Rotating Tibial Platforms comply." (Doc. 41, Ex. 2.) Dr. Thompson found average particle diameters of 240 and 242 microns, which were within the 168-258 micron range of Supplement 17. (*Id.*)

Plaintiff has not offered any evidence that his LCS Knees did not comply with the specifications in effect at the time of their manufacture.[9] Without expert testimony,

---

[7] As part of the PMA approval process, the FDA requires applicants to supplement their applications before changing the product.

[8] The specifications found in Premarket Approval Supplement 17 are referred to as ES-002 (Engineering Specifications 002).

[9] Moreover, as argued by defendants, "plaintiff has offered no evidence that the loosening of his implants was caused by the product at all, much less by a defect in the product." (Doc. 38 at 23.)

plaintiff fails to create an issue of fact that his knees were not "properly prepared."[10]
Consequently, summary judgment is due to be granted as to plaintiff's manufacturing defect claim.

## *2. Inadequate Warning*

Plaintiff alleges that his LCS Knees were not accompanied by proper directions and warnings. In the case of an unavoidably unsafe but properly prepared product, the adequacy of the accompanying warning determines whether the product is defective or unreasonably dangerous. *Stone*, 447 So. 2d at 1304 (citing *Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1274 (5th Cir. 1974)). Unavoidably unsafe products, when properly prepared and accompanied by proper directions and warnings, are not defective or unreasonably dangerous under the AEMLD. *See Stone*, 447 So. 2d 1301.

---

[10]According to defendants, an additional deficiency of Dr. Thompson's report is that it does not state that the alleged difference between particle size has any biological significance. (Doc. 38 at 16-19.) However, Dr. Thompson stated that average particle size affects the bonding strength of the prosthesis to bone cement or natural cement, and that reduced bonding strength could have caused plaintiff's device to loosen prematurely. (Doc. 41, Ex. 1.) According to Dr. Thompson, "[b]iomechanical engineering research publications have shown that particle size can affect the ingrowth of natural bone, thus changing the strength of the interface and service life of the device." (*Id.*) Therefore, assuming Dr. Thompson is qualified to make such an opinion, it appears that he has at least stated that the alleged difference in particle size has biological significance.

However, Dr. Thompson is not qualified to make such an opinion. (Doc. 17.) In *Emody*, the court noted that (the same) Dr. Thompson would not be qualified to opine that a broken rod caused the plaintiff's injuries. *Emody*, 238 F. Supp. 2d at 1295. Dr. Thompson's resume shows a great deal of expertise in metallurgy, materials, and engineering. (Doc. 41, Ex. 1.) Therefore, he is qualified to testify as to the variations in particle size. However, considering his lack of any medical background, he is not qualified to testify as to the effect this difference in particle size has on a patient. *See Emody*, 238 F. Supp. 2d at 1294-1295 ("Dr. Thompson never states that any of the alleged defects was the medical cause of injury, and as a non-physician he would hardly have expressed such an opinion even if he had formed it").

"Under the learned intermediary rule, the manufacturer's duty to warn is limited to an obligation to advise the prescribing physician of any potential dangers." *Emody*, 238 F. Supp. 2d at 1296 (citing *Stone*, 447 So. 2d at 1304). *See also Morguson v. 3M Co.*, 857 So. 2d 796, 801-02 (11th Cir. 2003) ("[p]ursuant to the learned-intermediary doctrine, [the manufacturer] had no duty to provide warnings to [the plaintiff]; rather, [the manufacturer's] duty was to warn the physicians and perfusionists . . . who used the vent tubing").

In the present case, plaintiff argues that DePuy's warning was inadequate. Plaintiff cites a New Mexico court for the proposition that, when a medical device is involved, "the manufacturer must have provided a warning as to the *specific* problem that arose in order to avoid liability for injuries caused by the defect." (Doc. 40 at 7.) In *Perfetti v. McGhan Medical*, the court held that a general warning of the danger of deflation did not dispose of the warning issue because the surgeon "had only minimum knowledge of delayed deflation at the time the prosthesis was implanted." *Perfetti*, 662 P.2d 646, 651 (N.M. App. 1983). Plaintiff applies this logic to the present case, arguing that defendants' warning did not address the specific circumstances of the product failure. (Doc. 40 at 7.)

DePuy's warning states that "failure to use the optimum size implant, failure to adequately seat the component adjacent to adequate bone and failure to ensure that the component is stable may result in dislocation, subsidence, fracture or loosening of the

14

components." (Doc. 40, Ex. 2 at 11.) The warning also advises that the procedure "requires careful patient selection," and that "it is necessary that there be a close bone/prosthesis interface for the components utilized during the operative procedure." (*Id.*) Plaintiff admits that the insert accompanying DePuy's LCS Knee components warned of the possibility of the components' loosening, but notes that it does not mention "the possibility that coating thickness may affect bonding, or that loosening may occur in the absence of the conditions set forth in the warning." (Doc. 40 at 7.)

Plaintiff must overcome several obstacles to his inadequate warning claim. First, plaintiff's inadequate warning theory is complex, and plaintiff has offered no expert testimony. "Although expert testimony as to the adequacy of a warning in connection with a drug is not necessary where any lay person can understand the insufficiency of the warning, in a complex products liability case expert testimony may be required to determine whether the manufacturer's warning to the medical community was adequate." *Am. L. Prod. Liab.* 3d § 89:13. "[T]he adequacy or inadequacy of a drug warning to inform a physician must, except in the more obvious situations, be proved by expert testimony, since the manufacturer's duty to warn of the drug's dangerous side effects is directed to the physician rather than the patient, and since the terms and applications of a warning on a drug, in order to have meaning, must be explained to the jury." 63A *Am. Jur. 2d Products Liability* § 1222. Therefore, plaintiff's failure to warn claim requires expert testimony as to the adequacy of the warning, and plaintiff has not produced such

expert testimony.

Second, plaintiff has not submitted evidence that the alleged failure to warn was a proximate cause of his injuries. "The element of proximate cause is essential to the plaintiff's prima facie case of negligent failure to adequately warn." *Gurley v. American Honda Motor Co.*, 505 So. 2d 358, 361 (Ala. 1987). Furthermore, "[a] negligent-failure-to-adequately-warn case cannot be submitted to a jury unless there is some evidence that the allegedly inadequate warning would have been read and heeded and would have kept the accident from occurring." *Id.* at 361 (citing *E.R. Squibb & Sons, Inc. v. Cox*, 477 So. 2d 963 (Ala. 1985)). Accordingly, in a "learned intermediary" case, a plaintiff must show that, "had the defendant given an adequate warning, it would have been read and heeded by the prescribing physicians." *Brasher v. Sandoz Pharmaceuticals Corp.*, 2001 U.S. Dist. LEXIS 18364 at *45 (N.D. Ala. 2001) (citing *Gurley*, 505 So. 2d at 361). For example, in *Emody*, the plaintiff failed to present a genuine dispute of material fact concerning defendant's warnings when the doctor testified that he did not rely on defendant's warnings. *Emody*, 238 F. Supp. 2d at 1296.

In the present case, plaintiff has not presented evidence that Kenneth W. Bramlett, M.D., the implanting surgeon, would have read and heeded a different warning. Dr. Bramlett's deposition reveals that he was aware of the risk of the possibility of loosening. (Doc. 37, Ex. 1 at 7, 20, 61-63.) Plaintiff has not submitted evidence that Dr. Bramlett would not have used DePuy's prosthetic knee if the warning had specifically addressed

16

the effect of particle size or coating thickness on bonding.  *See Gurley*, 505 So. 2d at 361.

Therefore, plaintiff has also failed to establish a genuine issue of material fact as to his inadequate warning claim.

### III.  CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendants is entitled to judgment as a matter of law.  An order granting defendant's motion for summary judgment will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this the 12th day of March, 2007.

*/s/ Sharon Lovelace Blackburn*
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE